*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0075P (6th Cir.)
File Name: 00a0075p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

KATHERINE GARDENHIRE and
WALTER GARDENHIRE,
　　　*Plaintiffs-Appellees,*

　　　*v.*

DONALD SCHUBERT, in his
individual and official
capacity as Chief of Police,
　　　*Defendant-Appellant.*

No. 98-6434



Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 97-00061—Thomas A. Higgins, District Judge.

Argued: August 5, 1999

Decided and Filed: March 2, 2000

Before: BATCHELDER and COLE, Circuit Judges;
MARBLEY, District Judge.*

---

\* The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

—————————————

## COUNSEL

**ARGUED:**  Daniel H. Rader III, MOORE, RADER, CLIFT & FITZPATRICK, Cookeville, Tennessee, for Appellant. Lisa B. Harris, HARRIS LAW FIRM, Cookeville, Tennessee, for Appellees.  **ON BRIEF:**  Daniel H. Rader III, Lane Moore, MOORE, RADER, CLIFT & FITZPATRICK, Cookeville, Tennessee, for Appellant. Lisa B. Harris, Samuel J. Harris, HARRIS LAW FIRM, Cookeville, Tennessee, for Appellees.

MARBLEY, D. J., delivered the opinion of the court, in which COLE, J., joined.  BATCHELDER, J. (pp. 26-30), delivered a separate opinion concurring in part and dissenting in part.

—————————————

## OPINION

—————————————

ALGENON L. MARBLEY, District Judge.  Plaintiffs-Appellees Katherine and Walter Gardenhire brought this suit against the Defendant-Appellant, Algood Police Chief Donald Schubert, alleging that Chief Schubert violated their civil rights, in violation of 42 U.S.C. § 1983,  by arresting them without probable cause and refusing to arrest and to prosecute their neighbor for burglarizing their retail business.  Chief Schubert filed a motion for summary judgment based on qualified immunity, which the district court denied.  This interlocutory appeal followed, and raises the same questions presented in the court below.  For the following reasons, we **AFFIRM** in part and **REVERSE** in part the judgment of the district court.

### I.

In December of 1996, Katherine Gardenhire owned a retail clothing store called Uniquely Yours.  Located immediately

cause to arrest. Even absent probable cause, qualified immunity is available if a reasonable police officer could have believed that his or her conduct was lawful, in light of clearly established law and the information the searching officers possessed. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In 1996, the clearly established law of probable cause in this circuit was *Criss v. City of Kent*. The majority spends some three pages distinguishing this case, but Chief Schubert was not required to anticipate the majority's opinion here. Chief Schubert was entitled to rely on the plain holding of *Criss*, and a reasonable and prudent man, rather than a legal technician, *cf. Brinegar v. United States*, 338 U.S. 160, 175 (1949), could have read *Criss* to authorize the arrest, without further inquiry, of individuals who were in possession of particular goods that had been explicitly identified as stolen. Accordingly, I must dissent from this portion of the majority's opinion.

adjacent to Ms. Gardenhire's establishment was a thrift shop owned by Mary Della Sala. The two businesses shared a common interior doorway. The bathroom and climate-control panel for both stores were located in Ms. Della Sala's shop. Some time shortly before December 1996, Ms. Gardenhire and Ms. Della Sala agreed to trade store fronts. On December 31, the two women were in the process of moving their merchandise; both women had access to the other's establishments and each had property in both locations.

On December 31, 1996, Ms. Della Sala telephoned the Algood Police Department to report a theft of property from her thrift shop. She claimed that a banjo, fiddle, pink flamingo dish, television and VCR were among the items stolen. Algood Police Officer Bill Davis responded to Ms. Della Sala's call by going to her store; he subsequently contacted Chief Schubert, who was also acting detective for the city. When Chief Schubert arrived on the scene, Officer Davis told him that Ms. Della Sala had reported certain items missing from her store, and that some of these items were visible, through the windows, inside Uniquely Yours.

Chief Schubert, dressed in civilian clothes, and another officer, in uniform, then went to the Gardenhires' home and asked them to come to the police station as part of the investigation. There is no evidence in the record as to how the officers phrased this directive. Although Katherine Gardenhire is the sole owner of Uniquely Yours, the police also solicited the cooperation of her husband, Walter Gardenhire. The Gardenhires are an interracial couple: Katherine is Caucasian, and Walter is African-American.

The Gardenhires drove their own car to the station, where they met Chief Schubert and Officer Davis. Chief Schubert explained why the couple had been summoned there and read them their *Miranda* rights. The Gardenhires agreed to cooperate in the investigation and answered all police questions. During the interview, the couple admitted that they had, at their home, the flamingo dish Ms. Della Sala reported stolen. They also told the police that they had a key to the

Della Sala store.  Ms. Gardenhire alleges that she asked to call her attorney at one point during the questioning, but the police denied the request.  The police asked for permission to search Uniquely Yours, and Mr. Gardenhire signed a consent to search form.  Ms. Gardenhire claims that throughout this encounter, Chief Schubert made "condescending glares" at her and her husband.  After spending some hours at the police station[1], the Gardenhires left, unaccompanied, in their own car, and retrieved the flamingo dish from their home.  They then met the police at their store.

At the store, Mr. Gardenhire opened the door and allowed Officer Davis and Chief Schubert to enter and recover Ms. Della Sala's items.  The police found all of the goods Ms. Della Sala claimed were stolen.  At that point, both officers noted that the placement of these items was oddly conspicuous.  Officer Davis thought it would be "foolish" for someone to steal merchandise and then display it in the next-door window in plain view.

While the police were recovering Ms. Della Sala's items, Ms. Gardenhire noticed that several pieces of merchandise from Uniquely Yours were missing.  Mr. Gardenhire discovered that the cash register was gone.  The Gardenhires suspected that Ms. Della Sala had stolen the items and told Chief Schubert that they had been robbed.  The officer refused to deal with their complaint.  Ms. Gardenhire became agitated and demanded to make a police report.  According to Ms. Gardenhire's affidavit, Chief Schubert told her to "shut up," and ordered her to leave the store and wait in her car.  She did so.

Soon afterwards, Chief Schubert asked the Gardenhires to follow Officer Davis to the Putnam County Justice Center to present the facts to Magistrate Martin Wheeler.  He advised the couple that they would be booked on charges of theft, burglary and criminal trespass, and would have to post bond

---

[1]The parties have not stated, nor does the record reflect, exactly how long the Gardenhires were detained at the police station.

fact in the Gardenhires' possession, according to the majority, "[f]urther investigation was necessary at that point."  The majority goes on to speak of a "duty to investigate an alleged crime before making an arrest," suggesting that Chief Schubert was obligated to elicit and consider an exculpatory explanation from the Gardenhires.  In so doing, the majority—although denying that it is doing so—subtly promulgates the rule that arresting officers have a duty to conduct an investigation into the basis of an eyewitness report before making an arrest that is founded on the report.  *See Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1453 (9th Cir. 1991) (Hall, J., concurring).

This holding flies in the face of *Criss*'s explicit admonition that "no such duty to investigate can nor should be created." *Criss*, 867 F.2d at 263.  And *Criss* is bottomed on Supreme Court caselaw.  In *Baker v. McCollan*, the Supreme Court held that, "Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate every claim of innocence . . . ."  *Baker*, 443 U.S. 137, 145-46 (1979).  Although the plaintiff in *Baker* did not bring a claim under the Fourth Amendment, this court, in *Criss*, and others have applied the Supreme Court's decision in the context of probable cause.  *Criss*, 867 F.2d at 263; *Pickens v. Hollowell*, 59 F.3d 1203, 1207 (11th Cir. 1995).  The result is clear: a duty to investigate is no part of the probable cause determination.  *Criss*, 867 F.2d at 263; *Kelley v. Myler*, 149 F.3d 641, 646-47 (11th Cir. 1998) ("We refuse to add this extra requirement to the probable cause determination . . . . The inquiry is whether an officer has reasonable grounds on which to act, not whether it was reasonable to conduct further investigation.").

Even if the majority were correct that the information in Chief Schubert's possession "was not enough to justify an arrest," the Chief would still be entitled to summary judgment on the basis of qualified immunity.  The doctrine of qualified immunity does not require that there actually be probable

the determination whether probable cause to arrest exists. A policeman, however, is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause. . . .

To hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming "it wasn't me."    And if the arresting officer failed to investigate such claims prior to arrest, the arrestee could bring a section 1983 suit. . . .    [W]e find that no such duty to investigate can nor should be created.

*Criss*, 867 F.2d at 263 (citations omitted).

The majority attempts, unconvincingly, to distinguish *Criss*. The majority suggests that the items in *Criss* were of the type that one must presume are stolen, while those in this case could be deemed stolen only from Ms. Della Sala's accusation.  But this is to say that an inference that an officer might logically draw from the nature of a stolen object is entitled to greater weight than the testimony of the victim of the crime—a premise that itself is contrary to established precedent. Where, as here, a citizen informant is the victim of the crime in question, her report is entitled to great weight in the probable cause determination.  *See, e.g.*, *Adams v. Williams*, 407 U.S. 143, 147 (1972). Indeed, as this court has recently pointed out, a crime victim's accusation standing alone can establish probable cause. *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999); *see also United States v. Maryland*, 479 F.2d 566, 569 (5th Cir. 1973) (holding that "information given to law enforcement authorities by the victim of the crime immediately after its occurrence was clearly sufficient to supply probable cause for appellant's arrest").

From these shaky ramparts, the majority launches its principal assault on the holding of *Criss*.  After Chief Schubert had received the crime victim's complaint, and after he had corroborated that the allegedly stolen goods were in

to be released.   Ms. Gardenhire's affidavit describes her impressions at that point: "We were not given a choice to go and I understood that if I did not drive myself that I would be physically forced to go. We were warned not to deviate from the specified route and that if we did not show up at the Putnam County Justice Center that a capias would be issued for our arrest."  The parties stipulate that the police did not place the Gardenhires in a police car, nor did the officers say "you are under arrest," handcuff or physically touch the couple.  The Gardenhires complied with Schubert's direction and followed Officer Davis to the Justice Center in their own car.  As Officer Davis led the couple to the Justice Center, he did not use his police lights or siren.

At the Justice Center, Magistrate Wheeler spoke to the Gardenhires.  After this interview, the magistrate determined that there was no probable cause to arrest the couple, and concluded that this was a civil matter.  At some point during the Justice Center episode, Chief Schubert told the couple they should "just collect up the rest of [their] things and get out of town."    The Gardenhires were not booked, fingerprinted or photographed.  They were not incarcerated and were free to leave after the interview with Magistrate Wheeler.

On June 16, 1997, The Gardenhires brought this suit in the United States District Court for the Middle District of Tennessee against Chief Schubert and the Algood Police Department. Chief Schubert is the only remaining defendant, and is sued in both his individual and official capacity. The Gardenhires have brought two claims against Chief Schubert pursuant to 42 U.S.C. § 1983.  First, the Gardenhires allege that Chief Schubert violated the Fourth Amendment's prohibition against unreasonable searches and seizures by arresting them without probable cause.    Second, the Gardenhires claim Chief Schubert violated the Fourteenth Amendment's guarantee of equal protection of the laws by not pursuing an investigation against  Ms. Della Sala, and arresting the Gardenhires instead.   The second claim is premised on the theory that the officers' failure to investigate

was motivated by the fact that the Gardenhires are an interracial couple.

On November 14, 1997 Chief Schubert filed a motion for summary judgment arguing that he is protected from this suit by the doctrine of qualified immunity. The district court denied this motion, holding that Chief Schubert was not entitled to qualified immunity because a reasonable jury could find that his actions on December 31, 1996 amounted to an arrest of the Gardenhires, and that the arrest was made without probable cause. The district court also held that selective enforcement of state laws is actionable under the Equal Protection Clause of the Fourteenth Amendment. Chief Schubert now brings this interlocutory appeal of the issues raised in his original motion for summary judgment.

## II.

The denial of a summary judgment motion on the issue of qualified immunity is immediately appealable. *See Mitchell v. Forsyth*, 472 U.S. 511 (1985). The issue of qualified immunity is a question of law to be reviewed *de novo* by this Court. *See Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir. 1991). Summary judgment is only appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All facts, as well as all inferences drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Schubert claims he is entitled to summary judgment based on the affirmative defense of qualified immunity against the Gardenhires' § 1983 claims. Section 1983 provides:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

Here, the apparent victim of an alleged theft accused the Gardenhires of the crime, and the objects allegedly stolen were found in the Gardenhires' actual or constructive possession. These objective factors support a reasonable belief that the Gardenhires had committed the offense of theft; the fact that before he instructed the Gardenhires to go to the Justice Center, Chief Schubert declined to conduct further investigation on the basis that the allegedly stolen objects were visible through a window, or on the basis that the Gardenhires protested their innocence, does not vitiate probable cause. A panel of this court so held in *Criss v. City of Kent*, 867 F.2d 259 (6th Cir. 1988), a case whose precedential grasp the majority engages in considerable acrobatics to evade.

In *Criss*, police officers observed through an open window street signs belonging to the City of Kent. The officers obtained a search warrant and questioned Criss, who resided in the apartment. Criss maintained that the signs had been taken by his roommate. The officers nevertheless arrested him for receipt of stolen property. A prosecutor later dismissed the charge, and Criss brought a § 1983 action for violation of his Fourth Amendment rights.

Despite Criss's plausible on-the-spot explanation of his association with the signs, and despite the fact that someone in receipt of stolen signs would be unlikely to display them to public view, this court held that the arresting officers had probable cause for the arrest. The court noted that the signs were either the property of the City or were remarkable replicas. Because Criss had either constructive or actual possession of them, the court concluded, the officers had reasonable ground for their belief that Criss had received stolen property. The court went on to make clear that a duty to investigate is not part of the probable cause inquiry. The court's holding in this regard is worth setting out at length:

A suspect's satisfactory explanation of suspicious behavior is certainly a factor which law enforcement officers are entitled to take into consideration in making

---

## CONCURRING IN PART, DISSENTING IN PART

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part.  The majority opinion creates a new factor in the determination of probable cause:  a duty to investigate.  Because this innovation runs counter to the settled law of this circuit, and because Chief Schubert can hardly be expected to have anticipated it, I must dissent from Part II of the majority opinion.

When viewed in the light most favorable to the plaintiffs, the evidence establishes that from their earliest encounter with the Gardenhires, the police were in possession of four facts.  First, Mary Della Sala complained that her belongings had been stolen, and that they were visible through the windows of the Gardenhires' shop.  Second, the allegedly stolen items were in fact in the Gardenhires' shop.  Third, the placement of the items in public view was somewhat suspicious.  Finally, the Gardenhires professed no knowledge of the theft.

These facts plainly support a finding of probable cause, regardless of when the Gardenhires were "arrested."[1] Probable cause means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  It is not an exacting standard; probable cause requires only the probability of criminal activity, not some type of "prima facie" showing.  *Illinois v. Gates*, 462 U.S. 213, 235 (1983).

---

[1] Although I question whether the Gardenhires were ever arrested, I will not take up the cudgels on that subject here.  The important point is that the police had probable cause to arrest them after the initial interview, and the totality of the circumstances did not subsequently tip the balance in favor of the Gardenhires.

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere. *See Tuttle v. Oklahoma City*, 471 U.S. 808 (1985).  In this case, the Gardenhires allege that Schubert violated their Fourth Amendment right to be free from unreasonable searches and seizures as well as their Fourteenth Amendment right to equal protection of the laws.

The affirmative defense of qualified, or good faith, immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  An official may, however, be held personally liable for civil damages for unlawful official action if that action was not objectively reasonable in light of the legal rules that were "clearly established" at the time it was taken. *See Anderson v. Creighton,* 483 U.S. 635, 639 (1987).  This "objective legal reasonableness" standard analyzes claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

When determining whether a right is "clearly established," this Court must look "first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits." *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  However, "[t]his not to say that an official action

is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citations omitted).

Where a defendant moves for summary judgment based on qualified immunity, the plaintiff must first identify a clearly established right alleged to have been violated and second, establish that a reasonable officer in the defendant's position should have known that his conduct violated that right. *See Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995); *Johnson v. Estate of Laccheo*, 935 F.2d 109, 111 (6th Cir. 1991). The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity. *See Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991). The defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question. Thereafter, the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct. *See Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). This Court has held, however, that:

> summary judgment would not be appropriate if there is a factual dispute (*i.e.*, a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights. Summary judgment also should be denied if the undisputed facts show that the defendant's conduct did indeed violate clearly established rights. In either event, the case will then proceed to trial. . . .

*Poe v. Haydon*, 853 F.2d 418, 425-26 (6th Cir. 1988) (citations omitted).

In this case, to determine whether Chief Schubert's actions violated any clearly established constitutional rights, this

ignore, *see Criss*, 867 F.2d at 262, -- rather than in the "citizen making a complaint" category. While Ms. Della Sala's store may have been similarly situated to the Gardenhires geographically, by virtue of the timing of their respective complaints, she was not otherwise similarly situated to the Gardenhires on December 31, 1996. There was no police report implicating Ms. Della Sala of a crime.

Second, the Gardenhires have not presented any evidence to support their claim that Chief Schubert purposefully discriminated against them because they are an interracial couple. While Chief Schubert's manners may not have conformed to Emily Post standards, there is no evidence that he was motivated by racial animus. The Gardenhires' basic argument is that the police had no logical reason to prosecute them rather than Ms. Della Sala, so the arrest must have been motivated by their interracial marriage. While such reasoning would be sufficient in establishing a *prima facie* Title VII case, the standard for a selective enforcement claim is much more demanding. The Gardenhires have failed to establish that Chief Schubert acted with discriminatory purpose, nor have they presented the "clear evidence" of misbehavior sufficient to sustain their selective enforcement claim to overcome the presumption that the state actors have properly discharged their official duties. In light of the deference given to the discretionary decisions of law enforcement officers, and the dearth of evidence to the contrary, the district court's decision on this issue is therefore **REVERSED**, and the Gardenhires' Equal Protection claim is **DISMISSED**.

may find he was arrested and that *his* arrest, at least, was based on racial animosity. And, just as a police officer may not unevenly apply the laws against a citizen because of his race, neither may he apply the laws unevenly because a citizen is married to someone of a particular race. *See Loving v. Virginia,* 388 U.S. 1, 8 (1967) (holding that state may not treat interracial marriages differently from other marriages).

There is no question that in 1996, it was clearly established that police officers could not selectively enforce state laws based on racial distinctions.

### 2. Issues of Law and Fact

The Gardenhires argue that the facts, as they have alleged, support their claim of selective enforcement. Applying the *Anderson* test, the couple contends that a reasonable jury could find, first, that Chief Schubert singled out the Gardenhires for prosecution by arresting them and not Mary Della Sala, who was not involved in an interracial relationship, but was otherwise similarly situated to the Gardenhires. Second, the Gardenhires argue that a jury could find that Chief Schubert arrested them with a discriminatory purpose, based on his "condescending glares" and the "get out of town" comment. Third, the jury could find that Chief Schubert's actions had a discriminatory effect on an identifiable group: the Gardenhires, an interracial couple, were arrested, while Ms. Della Sala, who is not involved in an interracial relationship, was not. The Gardenhires' argument stretches the facts beyond reason to fit their chosen legal theory.

First, the Gardenhires and Ms. Della Sala were not similarly situated on December 31, 1996. For most of that day, there was a police report implicating the Gardenhires in a crime; while they may not have had probable cause to arrest them, the police were justified in treating them as suspects in a theft. When the Gardenhires did eventually attempt to make a police report concerning Ms. Della Sala, they were already criminal suspects, putting their comments in the "suspect making an excuse" category -- which police may choose to

Court must decide, first, what the state of the law was on December 31, 1996, and, second, whether there is a factual dispute on which the question of immunity turns. *See Rich*, 955 F.2d at 1095.

### A.  *Jurisdiction*

The Court's jurisdiction over interlocutory appeals on a claim of qualified immunity is limited to considering pure issues of law. *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (finding that "[a] defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law.") (citations omitted). Mixed questions of fact and law are treated as questions of law. *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc).

Here, the Court finds that it has jurisdiction to hear the Defendant's interlocutory appeal on the issue of qualified immunity, as the question of whether there was probable cause for an arrest is a mixed question of law and fact. *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999) (citing *Ornelas v. United States*, 517 U.S. 690, 696-98 (1996)). In finding that the determination of probable cause is a mixed question of law and fact, the Supreme Court in *Ornelas* reasoned that:

> The principal components of a determination of reasonable suspicion or probable cause will be the events which first occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: 'The historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another

way, whether the rule of law as applied to the established facts is or is not violated.'

*Ornelas*, 517 U.S. at 696-97 (citing *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)).

In making the determination of whether the right was clearly established in this case, the Court must apply the facts to determine the legal question of whether there was probable cause for an arrest. This Court will only rely on the undisputed facts in making this determination. The undisputed facts are as follows: when the Gardenhires were at their residence, Chief Schubert told them that they "needed to go" to the police station. The Gardenhires, while at the police station, were read their *Miranda* rights and questioned. It is also undisputed that when the Gardenhires were with Chief Schubert at their store, Chief Schubert told the Gardenhires that they "needed to go" to the Justice Center; instructed them that they "needed to follow" a police officer to the station; and advised them that they would be booked on criminal charges and released on bond once they reached the Justice Center.

As for the determination of probable cause, the undisputed facts before the Court are that Mary Della Sala claimed that objects from her store were missing and that those objects were visible in the store-front window of the Gardenhires' store which was adjacent to Sala's store.

What is in dispute in this case is whether Chief Schubert arrested the Gardenhires, and if he did arrest them, whether he had probable cause to do so. Just as in *Williams v. Mehra*, the only "'facts' in dispute are the ultimate issues to be decided by applying the law to the basic facts. . . ." 186 F.3d at 690. The determination of whether there was probable cause and whether there was an arrest involves mixed issues of law and fact, which are treated as an issue of law, and vest this Court with jurisdiction to hear the present interlocutory appeal. *Id.* at 690.

that the plaintiff make at least a *prima facie* showing that similarly situated persons outside her category were not prosecuted." *S temler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997). Furthermore, "there is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary; the standard is a demanding one." *Id.* (citations omitted). The Gardenhires' Equal Protection claim is based on the theory that Chief Schubert selectively enforced Tennessee's criminal laws by arresting them on December 31, 1996 and refusing to investigate Ms. Della Sala.

Appellant argues that the Gardenhires have not identified a clearly established right which he violated on December 31, 1996, because they have not met their burden of producing a case showing that they have a constitutional right to have criminal laws enforced against other citizens. Appellant's argument misapprehends the doctrine of selective enforcement. While it is true that states have no constitutional duty to protect citizens from violence by private actors, *see DeShaney v. Winnebago County Dept. of Soc. Serv.*, 489 U.S. 189, 195 (1989), it is clearly established that "the State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *Id.* at 197 n.3 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

Appellant also raises the argument that because Ms. Gardenhire is Caucasian and admits to being the sole owner of Uniquely Yours, neither Mr. nor Ms. Gardenhire can bring an Equal Protection claim. There are several flaws with this premise. To begin, this is the first time Appellant has raised the issue. Appellate courts are free to decline consideration of arguments made for the first time on appeal. *See id.* at 195 n.2. This argument also fails on substantive grounds. First, the Gardenhires' Equal Protection claim stems not from Chief Schubert's failure to protect Ms. Gardenhires' store, but from the allegedly wrongful *arrest* of the couple. There is no dispute that Mr. Gardenhire is African-American; the jury

this context, the court should dismiss a case, or take other appropriate action, if the defendant can prove that the prosecutor or investigator intentionally singled him out for punishment because of membership in a protected group or the exercise of a constitutionally protected right." *Id.* "In our criminal justice system, the Government retains broad discretion as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Although such discretion is broad, "it is not unfettered." Selectivity in the enforcement of criminal laws is subject to constitutional constraints. In particular, the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification." *Id.* at 608 (citations omitted).

"Selective enforcement can also lead to § 1983 liability if the plaintiff pleads 'purposeful discrimination.'" *Id.*; *see also Oyler v. Boles*, 368 U.S. 448, 456 (1962) (selective enforcement is a federal constitutional violation if "based upon an unjustifiable standard such as race, religion, or other arbitrary classification"). Discrimination is "purposeful" if it is intended to accomplish some "forbidden aim." *See Futernick*, 78 F.3d at 1056. Such "forbidden aims" include intentional selective enforcement because of race, nationality, religion, gender or "other arbitrary classification." *Id.* at 1056-57.

This Court has established a three-part test for determining if selective enforcement has occurred:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991). With regard to the first element, "it is an absolute requirement

### B.  *Fourth Amendment: The Right to be Free from Unreasonable Seizures*

### 1. State of the Law

The Fourth Amendment guarantees that government officials may not subject citizens to unreasonable searches or seizures without proper authorization. An intrusion that lacks such authorization is presumptively unreasonable, "subject only to a few specifically established and well-delineated exceptions." *See Katz v. United States,* 389 U.S. 347, 357 (1967). For example, police only need a reasonable suspicion of criminal activity to conduct a brief investigatory detention. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). The determination of "reasonableness" in a *Terry* stop context depends on a balance between "the need to search [or seize] against the invasion which the search [or seizure] entails." *Id.* at 21. When a detention rises to the level of a full-fledged arrest, however, the Fourth Amendment demands that the seizure be supported by probable cause. *See Dunaway v. New York*, 442 U.S. 200, 212-14.

There is no question that in 1996 "the law was clearly established that, absent probable cause to believe that an offense had been committed, was being committed, or was about to be committed, officers may not arrest an individual." *See Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999)(discussing the state of the law in 1991). Thus, the only questions as to the Gardenhires' Fourth Amendment claim are those of fact: did Chief Schubert "arrest" the Gardenhires on December 31, 1996? If so, did the arrest lack probable cause? If a reasonable jury could answer "yes" to both questions, this case must proceed to trial.[2]

---

[2]These "facts" in dispute in the present case reach the ultimate issues to be decided and are not those factual disputes that would "divest the court of jurisdiction." *See Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999).

## 2. Mixed Question of Law and Fact

### a. Whether Officer Schubert "Arrested" the Gardenhires

To constitute a seizure of the person, just as to constitute an arrest, there must be either the application of physical force, however slight, or, where that is absent, submission to an officer's "show of authority" to restrain the subject's liberty. *See California v. Hodari D.*, 499 U.S. 621, 626-28 (1991). In this case, it is undisputed that the officers never physically touched the Gardenhires. Thus, in determining whether couple was actually arrested, we must focus on whether the Gardenhires submitted to Officer Schubert's "show of authority." "The test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Id.* at 628. A person has been "seized" within the meaning of the Fourth Amendment when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 544 (1980).

Chief Schubert contends that because he never formally arrested the Gardenhires, the guarantees of the Fourth Amendment were never implicated. This argument fails. The Fourth Amendment's protections are not limited to traditional arrests: "a clear deprivation of liberty caused by law enforcement officers without formal words is nonetheless an arrest." *See Centanni v. Eight Unknown Officers*, 15 F.3d 587, 590 (6th Cir. 1994) (citations omitted). The Supreme Court has explained:

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. And our view continues to be that the line is crossed when the police, without probable cause or a

making the determination whether probable cause to arrest exists." *Criss*, 867 F.2d at 262. Here, a reasonable jury could find that Chief Schubert did not have probable cause, based on the totality of information he had at the time, to arrest the Gardenhires.

Furthermore, the jury will have to analyze the probable cause question in light of *when* they conclude that the arrest occurred, because the factors in the probable cause determination shifted as the day went on. As the police officers gathered more facts about the alleged crime, the totality of the circumstances changed. For example, if a jury finds that the arrest took place when the officers asked the Gardenhires to go to the police station, the probable cause determination centers on Ms. Della Sala's report and the siting of the "stolen" items in the window. If, however, the jury finds that the arrest occurred after the police visited Uniquely Yours with the Gardenhires, they will have to consider the Gardenhires' statements at the police station, and the fact that the officers noticed at their store the suspicious placement of the supposedly stolen items and heard the Gardenhires' allegation that they had been robbed. With such fluid, fact-specific elements at the heart of this probable cause inquiry, it is a question properly reserved to the fact-finding province of a jury. The district court's finding on this issue is, therefore, **AFFIRMED**.

### C. *Fourteenth Amendment: Selective Enforcement*

#### 1. State of the Law

"Sometimes the enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination. To address this problem, courts have developed the doctrine of selective enforcement." *Futernick v. Sumpter Township*, 78 F.3d 1051, 1056 (6th Cir. 1996). Selective enforcement claims are judged according to ordinary Equal Protection standards, which require a petitioner to show both a discriminatory purpose and a discriminatory effect. *See id.* Usually, claims of selective enforcement arise as a defense in criminal prosecutions. "In

In her Dissent, Judge Batchelder states that the Court has added a "duty to investigate" as a new factor to be used in determining probable cause. The Dissent finds that the police had probable cause irrespective of when the Gardenhires were arrested. The factors the Dissent puts forward as establishing probable cause include: that the allegedly stolen items were visible through the Gardenhires' shop; that the stolen items were actually located in the Gardenhires' shop, and finally, that the placement of the allegedly stolen items was suspicious. Citing *Criss v. City of Kent*, 867 F.2d 259 (6th Cir. 1998), the Dissent states that probable cause is not eliminated by the fact that the Gardenhires claimed they were innocent.

Contrary to the Dissent's assertion, this Court is not adding a duty to investigate as a  factor for the establishment of probable cause. This Court recognizes that an officer does not have to investigate independently every claim of innocence. *See Baker v. McCollan*, 443 U.S. at 145-56. But, this axiom does not suggest that an officer has *no* duty to investigate an alleged crime before making an arrest. A police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime. *See Beck*, 379 U.S. at 91. And, in obtaining such reliable information, an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence. Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence, before determining if he has probable cause to make an arrest. *See Dietrich*, 167 F.3d at 1012. While it is true that "[a] valid arrest based upon then-existing probable cause is not vitiated if the suspect is later found innocent," "[a] suspect's satisfactory explanation of suspicious behavior is certainly a factor which law enforcement officers are entitled to take into consideration in

---

warrant a finding that the Gardenhires had committed an offense or to establish probable cause. *See Beck v. Ohio*, 379 U.S. at 91. Therefore, the Chief is not entitled to summary judgment on the basis of qualified immunity.

warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

*Hayes v. Florida*, 470 U.S. 811, 815-16 (1985) (citations omitted). Thus, the fact that Chief Schubert did not formally arrest the Gardenhires does not resolve the issue of whether their detention amounted to an arrest requiring probable cause.

Instead, the question is whether a reasonable jury could find that a person in the Gardenhires' position would have felt free to leave. We agree with the district court's analysis in concluding that a jury could find that a reasonable person in the Gardenhires' position would not have felt free to leave. The undisputed facts the district court considered were that Chief Schubert: (1) told the Gardenhires at their residence they "needed to go" to the police station; (2) read them their *Miranda* rights at the police station; (3) questioned the Gardenhires extensively at the police station; (4) told the Gardenhires later, at the store, that they "needed to go" to the Justice Center; (5) instructed them that they "needed to follow" a police officer to the station; and (6) advised the Gardenhires that they would be booked on criminal charges and released on bond.

Based on these facts, a jury could find that a reasonable person in the Gardenhires' position would have felt that they were not free to leave. A police officer's statement that "you need to go" somewhere carries substantial authoritative weight. We think very few people could hear such a directive from a police officer and still think they were free to act otherwise. Once the police removed the Gardenhires from their home to the police station, the encounter took on an arrest-like nature. *See Hayes*, 470 U.S. at 816 (holding that

the line separating a *Terry* stop and an arrest is crossed when police "forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes"). The custodial nature of the police station encounter intensified with the time the Gardenhires spent there and the fact that Chief Schubert read them their *Miranda* rights. *See United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994) (holding police officer knew that *Miranda* rights are required to be given only to individuals who are in custody, and "[a]lthough giving *Miranda* warnings to a detainee may not automatically convert a *Terry* stop into an arrest, it is evidence that the nature of the detention has grown more serious"). The most compelling factor may be Officer Schubert's telling the Gardenhires, at their store, that they were going to be booked and released on bond once they reached the Justice Center. We do not think a reasonable person would believe he is free to leave after a police officer has stated that he must go to a government center to be "booked" and that he would have to post bond to be released.

In *United States v. Obasa*, 15 F.3d 603 (6th Cir. 1994), under facts similar to this case, this Court held that the police had in fact "arrested" the suspect. In *Obasa*, a police officer stopped a man in an airport, searched his clothing, gave him *Miranda* warnings and transported him to the police station in a police cruiser. The Court held that, although the police never formally arrested the suspect, under these circumstances the officer had gone beyond a mere *Terry* stop and had arrested the man. Except for the suspect's transportation in a police cruiser, the facts in *Obasa* are nearly identical to those presented in this case. Indeed, the Gardenhires were transported from their home, rather than an airport, implicating a higher level of intrusiveness. *See Hayes*, 470 U.S. at 815-16.

Additionally, the district court only considered the undisputed facts in making its arrest determination. There are disputed facts, such as Ms. Gardenhire's alleged attempt to call a lawyer, which a jury should hear. The facts we have on

Perhaps this investigation would reveal additional evidence of theft sufficient to establish probable cause. But, standing alone, the woman's mere allegation that the car was hers would not create probable cause that the man stole the Porsche.

The foregoing hypothetical is almost identical to the facts in this case. Chief Schubert had the following information when he began investigating the Gardenhires: that Mary Della Sala claimed that several items from her store were missing, and that these items were visible in the store-front windows of the adjacent store. We believe a reasonable jury could find that the police officers did not have probable cause to arrest the Gardenhires on this information alone. Certainly, there was enough evidence to justify a *Terry* stop; the police were authorized to ask the Gardenhires if the items belonged to them, to inquire as to why the items were in their store, and to gather information about the relationship between Ms. Della Sala and Ms. Gardenhire. But, Ms. Della Sala's mere allegation that she owned the items in Ms. Gardenhire's store-front was not enough to justify an arrest. Further investigation was necessary at that point. And if the officers had asked further questions, they would have learned that Ms. Gardenhire and Ms. Della Sala shared the facilities of both stores and were in the process of trading store fronts. Such information would lead a reasonable officer to consider that something other than a theft – such as misplacement or a simple misunderstanding – had occurred.[5]

---

[5]The Dissent finds that Chief Schubert should be granted qualified immunity even if the information the Chief had at the time was not enough to justify an arrest of the Gardenhires. The Dissent reasons that in 1996, when the Chief arrested the Gardenhires, *Criss* was the "clearly established law," and did not require police officers to investigate before arresting an individual who was in possession of items that were identified as stolen.

However, following *Terry v. Ohio*, 392 U.S. at 30, also clearly established law at the time of the incident, this Court finds that Chief Schubert only had a reasonable suspicion of criminal activity which would only justify a brief investigatory detention. *Id.* Chief Schubert did not have the requisite "reasonably trustworthy information" sufficient to

street signs – a good almost impossible for private citizens to obtain legally  – the police in *Criss* could have been almost certain that *someone* in the house had committed a crime. Even if the officers had believed the suspect's statement that he had not stolen the signs, the suspect still could have been guilty of other crimes, such as the receipt of stolen property, or aiding and abetting the theft.  Here, if the Gardenhires' statements were true, it would mean that they were not guilty of any crime. Moreover, there was evidence in addition to the Gardenhires' bare statements, that would lead a reasonable officer to rethink whether the Gardenhires had committed a crime. The obvious placement of the supposedly stolen goods and the common doorway between the shops should have triggered at least a suspicion that the "theft" was not what it appeared.

Unlike the street signs in *Criss*, the items in Uniquely Yours are not the type that one must presume are stolen. Guitars, banjos, televisions and VCRs are commonly -- and legally -- owned by countless people.  In this case, all the police had was the bare allegation by Mary Della Sala that these items belonged to her.  An allegation by one individual that items in another's possession actually belong to her is not enough to create probable cause that a crime has been committed. Consider the following situation: a woman flags down a police officer and points out a Porsche being driven by a young man, which the woman claims is her car and which has been stolen by the man.  Would the officer have probable cause to arrest the Porsche's driver at that point? We think not. The officer would have a reasonable suspicion of criminal activity justifying a brief investigatory detention pursuant to *Terry v. Ohio*, 392 U.S. at 30.  But, without more, the officer would not yet have the requisite "reasonably trustworthy information" sufficient to warrant a prudent man in believing that the young man driving the Porsche had committed or was committing an offense. *See Beck v. Ohio*, 379 U.S. at 91.  Rather, the police officer would have the right and duty to detain and question the driver for a short time: to ask if the car was his, research his licence plate, and request to see his drivers licence, registration and insurance.

the record before us are the mere skeleton of the story, which must be animated by the details of what happened when the police officers arrived at the Gardenhires home, spoke with them at the police station and interacted with them later at the store.  Other relevant points of inquiry include how long the Gardenhires were detained at the police station, and what exactly the officers said to the Gardenhires at different points during the investigation.  Because no physical force was applied, the officers' words at each location will be essential in determining whether a reasonable person would have felt free to leave.  And, of course, the jury must decide the extent to which they believe the  Gardenhires' version of events. The issue of whether Chief Schubert arrested the Gardenhires, therefore, is one which must be presented to a jury.

### b.  Whether Chief Schubert had probable cause to arrest the Gardenhires

Any arrest, whether formal or *de facto*, requires probable cause.  *See Centanni,* 15 F.3d at 602.  Thus, if a jury determines that Chief Schubert did arrest the Gardenhires, the next inquiry must be whether he had probable cause to do so. Generally, probable cause exists when the police have "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  "Probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *See Dietrich*, 167 F.3d at 1012.  "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor,* 60 F.3d 1211, 1215 (6th Cir. 1995).  Here, viewing the facts in a light most favorable to the Gardenhires, we must determine whether a jury could conclude that a reasonable officer could have believed that the couple had probably committed or were committing a crime. There is substantial evidence supporting each party's position.

As the Gardenhires point out, there were factors present at the time of the initial police investigation which may have made it unreasonable for Chief Schubert to believe that the Gardenhires had committed any crime. For example, the placement of the allegedly stolen goods was suspicious. It is unlikely that one store owner would steal goods from another and then leave those goods in the window of her own store-front. In fact, based on where the goods were found, two of the initial investigating officials believed that the Gardenhires had been set up: both Officer Davis and Magistrate Wheeler thought the alleged theft was a set-up. Even Chief Schubert admits now that the placement of the items suggests that the Gardenhires had not committed a theft.[3] And, the Gardenhires tried to explain to the officers then that they had not committed a crime, but had been the victims of one. The officers did not bother to investigate the Gardenhires' claim, which, in hindsight, appears to have been a reasonable one.[4]

On the other hand, there was substantial inculpatory evidence against the Gardenhires. The officers had received a report of theft and discovered the very items described in that report in the Gardenhires' store. The Gardenhires admitted to having a key to Ms. Della Sala's store and to having Ms. Della Sala's flamingo dish at their house.

It is true, as the appellant notes, that in *Criss v. City of Kent*, 867 F.2d 259 (6th Cir. 1988), this Court found that officers in a similar situation did have probable cause to arrest the suspect. In *Criss*, two police officers noticed, through the

---

[3]Chief Schubert has never admitted that he believed *at the time of his investigation* that the Gardenhires were set up – despite the Gardenhires' claim to the contrary.

[4]The Gardenhires argue that because Ms. Gardenhire and Ms. Della Sala were in the process of trading store-fronts, Chief Schubert had no probable cause to believe the items found in Uniquely Yours were stolen. The couple has not, however, provided any evidence demonstrating that Chief Schubert was at any time made aware of the women's business arrangement.

open windows of an apartment, City of Kent street signs hanging on the walls of the plaintiff's living room. The officers went in and spoke with the plaintiff, who admitted that he was a co-tenant of the house, and knew that the signs were hanging in his residence, but stated that they belonged to his roommate. The officers arrested him for receipt of stolen property. In fact, the plaintiff's roommate, alone, had stolen the street signs. The plaintiff brought suit against the officers, arguing that his innocence of the crime, combined with the officers' failure to investigate his involvement, meant there was no probable cause to arrest him. The Court found that the officers had probable cause to arrest the plaintiff. The Court reasoned:

> A suspect's satisfactory explanation of suspicious behavior is certainly a factor which law enforcement officers are entitled to take into consideration in making the determination whether probable cause to arrest exists. A policeman, however is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.

*Id.* at 262. "To hold otherwise," the Court explained, "would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me.'" *Id.* The *Criss* decision echoes the Supreme Court's prior reasoning in *Baker v. McCollan*, 443 U.S. 137 (1979), that "we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence." *Id.* at 145-56 (1979); *see also Coogan v. City of Wixom*, 820 F.2d 170 (6th Cir. 1987) ("Where there are sufficient facts to warrant a prudent person in a defendant's position to believe that a crime was committed and that the person charged committed it, the failure to make a further investigation does not negate probable cause").

While instructive, however, the *Criss* case is not entirely analogous to this one. Because the suspicious items were city